UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT SOUTH BEND

| | |
|---|---|
| JACK R. STRANG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  CAUSE NO.: 3:24-CV-1009-PPS-SJF |
| | ) |
| FRANK J. BISIGNANO, Commissioner | ) |
| of the Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Plaintiff Jack R. Strang once again seeks judicial review of the Social Security Commissioner's decision to deny his application for disability insurance benefits. The case has bounced back and forth between the district court and the agency on a couple of prior occasions. This time, Strang principally claims the Commissioner's decision was incorrect (thus necessitating another remand) because the ALJ failed to adequately consider a bit of testimony from an agency contracted medical expert. I disagree and will affirm the Commissioner's decision.

**Background**

This is Strang's third appeal to this court of his October 2017 application for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI"). Relevant here are the administrative hearings on June 22, 2022, and November 29, 2022, upon Strang's first remand, the August 14, 2024, administrative hearing upon Strang's second remand, and the subsequent August 30, 2024, ALJ decision denying his

application. Strang timely appealed the ALJ's August 30, 2024, decision denying his application, which is the one presently before the Court.

Strang alleges he became disabled after a motorcycle accident that occurred on August 9, 1987, when he was seventeen years old. He says he suffered a traumatic brain injury during this accident, which has led to a whole host of issues, including headaches and difficulty concentrating, that have worsened in the decades since the accident.

In the August 30, 2024, decision at issue, the ALJ found that Strang had several severe impairments: (1) obesity, (2) status post traumatic brain injury, (3) headaches, (4) depressive disorder, (5) anxiety disorder, and (6) alcohol use disorder. [DE 6 at 1092.[1]] The ALJ determined that Strang did not have an impairment or combination of impairments that met or medically equaled a listed impairment. [*Id.* at 1093–95.]

The ALJ then determined Strang's residual functional capacity ("RFC"), which is an evaluation of what a person can still do despite their physical or mental limitations. According to the ALJ, Strang could:

> [U]nderstand, remember, and carry out simple instructions and tasks, he can make judgments related to simple work-related decisions, he can respond appropriately to occasional interactions with coworkers, supervisors, and the general public, and he can respond appropriately to usual work situations. The claimant can deal with routine changes in a routine work setting free from fast paced production requirements such as assembly line type work activity and with no more than occasional changes in terms of work setting, tools, and processes.

---

[1] To ensure consistency across cites to the Parties' briefing, citations to the administrative record filed at DE 6 correspond to the blue file stamped digits at the top of the page.

2

[*Id*. at 1095.] The ALJ determined that Strang had no past relevant work (step four) but concluded that Strang could perform a significant number of other jobs in the national economy (step five) and denied Strang's application for disability benefits.

## Discussion

In a Social Security disability appeal, my role as district court judge is limited. I do not review the evidence to determine whether a claimant is disabled and entitled to benefits. Instead, I review the ALJ's written decision to determine whether the ALJ applied the correct legal standards and whether the decision's factual determinations are supported by substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). If substantial evidence supports the ALJ's factual findings, they are conclusive. *Id.*; 42 U.S.C. §405(g). The Supreme Court has said that "substantial evidence" means more than a "scintilla" of evidence, but less than a preponderance of the evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Evidence is substantial if a reasonable person would accept it as adequate to support the conclusion. *Durham v. Kijakazi*, 53 F.4th 1089, 1094 (7th Cir. 2022). In the disability context, "the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).

Although the standard of review is deferential, an ALJ can't just state a conclusion unmoored from the evidence. This means that an ALJ's "decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (quoting *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003)). Stated differently, the ALJ must build a

3

"logical bridge between the evidence and the conclusions" so that judicial review is meaningful. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) (citation omitted).

There is a five-step inquiry that the Social Security Administration ("SSA") must follow in evaluating claims for disability benefits. 20 C.F.R. § 404.1520(a)(4). The steps are:

> (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Fetting v. Kijakazi*, 62 F.4th 332, 336 (7th Cir. 2023) (cleaned up). The claimant bears the burden of proof at every step except step five. *Id.*

Strang claims two errors with the ALJ's RFC analysis. First, he says the ALJ failed to explain why she dismissed two opinions offered by the government's medical examiner Dr. Lauren Frey that weighed in favor of finding Strang disabled. Second, Strang says the ALJ failed to provide a "logical bridge" to explain her dismissal of opinions provided by Nurse Practitioner ("NP") Carole Derucki. Strang argues these errors diminished Dr. Frey's and NP Derucki's testimony concerning the time off task Strang's headaches and memory limitations cause him to suffer. I'll begin with Strang's arguments concerning Dr. Frey.

**I.   Dr. Frey**

Strang says the ALJ failed to meaningfully explain two potentially disabling opinions offered by Dr. Frey during a June 2022 administrative hearing. According to Strang, these opinions include: (1) that Strang's neuropsychological examination results

4

indicate he would require prompting or reminders to complete tasks and (2) Dr. Frey's statement that a treating provider would be in a better position to opine on Strang's symptoms and the limitations they cause.

Let's begin with a review of Dr. Frey's testimony at the June 2022 hearing. But first, some context. The June 2022 hearing was the first of two hearings that occurred after the initial remand of Strang's case in August 2021. ALJ Kathleen Winters presided over the June 2022 hearing. Dr. Frey testified that, based on her review of Strang's medical record, Strang had two neurological impairments: headaches and a history of traumatic brain injury. [DE 6 at 545.] She offered her opinion on Strang's functional limitations that resulted from these two neurological impairments, which included limits on lifting, climbing stairs and ramps, and avoiding ladders, scaffolds, unprotected heights, and moving mechanical parts. [*Id.* at 546.] Dr. Frey said she disagreed with certain of Nurse Practitioner Derucki's conclusions documented in Exhibit 12F for the hearing. Specifically, Dr. Frey testified that she did not believe Strang's reported headache symptoms were consistent with NP Derucki's migraine diagnosis. [*Id.* at 548–50.]

Dr. Frey also discussed two of Strang's 2018 neurological records, which included a February 2018 MRI and a January 2018 neurological examination. Concerning the MRI, Dr. Frey explained the three findings in the MRI report: (1) encephalomalacia in the right interior frontal lobe and the anterior right temporal lobe; (2) mild generalized brain atrophy and mild changes in white matter in both cerebral hemispheres; and (3) no acute or active appearing intercranial pathology. [*Id.* at 551,

5

309.] According to Dr. Frey, none of these etiologies were consistent with migraines or severe headaches. [*Id.* at 551.] Importantly, Dr. Frey also testified that she disagreed with Strang's attorney's statement that NIH guidance says headaches are a possible indicator of encephalomalacia. [*Id.* at 552.]

Dr. Frey also discussed the results of a January 16, 2018, clinical neuropsychological evaluation that concluded Strang had "variable" memory functioning with "weak encoding of both verbal and visual stimuli . . . rapid forgetting on delayed recall but intact recognition across most memory tests suggesting greater difficulty with encoding and retrieval." [*Id.* at 262, 553.] Strang's attorney asked Dr. Frey whether a person with the described encoding (formation of memories) and retrieval (recall of memories) issues would need promoting or reminders to complete tasks. [*Id.* at 553.] Frey replied, "[t]hat is reasonable, hypothetically." [*Id.* at 554.]

Concerning Strang's headaches, Dr. Frey acknowledged it was "possible" for someone experiencing headaches to experience some distraction. [*Id.* at 555.] Strang's attorney also referenced NP Derucki (who, as an aside, did not conduct either test discussed above) and asked Dr. Frey whether a treating clinician is in a better position to opine on a patient's symptoms and limitations. [*Id.* at 555.] Dr. Frey gave an unremarkable response: "I have heard that, yes." [*Id.*]

In March 2024, Strang and the Commissioner agreed to remand the March 2023 unfavorable decision that followed the 2022 administrative hearings. [*Id.* at 1177-78.] Upon this second remand, the Commissioner assigned a new ALJ, Stephanie Katich, to preside over Strang's case. ALJ Katich conducted an administrative hearing on August

6

14, 2024. Dr. Frey did not appear at this hearing. At the August 2024 hearing, Strang's attorney questioned the vocational expert about the impact of frequent unscheduled breaks and a need for repeated instruction of tasks. [*Id.* at 1144.] The vocational expert said frequent or constant reminders by supervisors of tasks already learned would be "unacceptable" in a work environment. [*Id.*] The vocational expert also said employers for unskilled work would not tolerate unscheduled breaks. [*Id.*]

In closing, Strang's attorney brought up Dr. Frey's testimony from 2022. Strang's attorney said Dr. Frey testified that a person with Strang's neurological exam findings "would reasonably need assistance with retrieval or help from others in the workplace." [*Id.* at 1146–47.] Strang's attorney also said Dr. Frey opined that NP Derucki's treatment notes were "indicative of a need for time off-task and absences that would be tolerable to employers." [*Id.* at 1147.] I assume Strang's attorney misspoke and meant to say "intolerable" (or there was a transcription error here). In the referenced treatment notes, NP Derucki noted Strang reported 30 headaches per month, and she found it likely Strang would be absent from, late to, or have to leave early from work more than four times per month. [*Id.* at 979–80.]

So, how did the ALJ treat this testimony? On the whole, she found Dr. Frey's opinion "persuasive regarding the TBI and headaches, as Dr. Frey was the only medical opinion to be based on a review of the entire, longitudinal record." [*Id.* at 1099.] The ALJ did not specifically mention Dr. Frey's testimony from the 2022 hearing that it was "reasonable, hypothetically" [*id.* at 554] for someone with Strang's neurological findings to require prompting and reminders. But the ALJ described Dr. Frey's testimony on the

7

topics of Strang's functional capacity, the possible etiologies for his headaches, and as will be discussed more below, Strang's neurological testing and NP Derucki's opinion. Concerning Dr. Frey, the ALJ said Strang's attorney's "version of [Dr. Frey's] testimony is not consistent" with her actual testimony because Dr. Frey "disagreed with [Strang's attorney's] interpretation of his online research in regard to encephalomalacia." [*Id.* at 1099.] Here, the ALJ seems to refer to the exchange between Strang's attorney and Dr. Frey concerning the NIH's views on the relationship between migraines and encephalomalacia.

The Commissioner's response to Strang's arguments concerning the ALJ's assessment of Dr. Frey's June 2022 testimony is twofold. First, the Commissioner argues Dr. Frey's response that it was "reasonable, hypothetically" for someone with Strang's neurological results to require frequent prompting and reminders was not a medical opinion at all. SSA's regulations sort evidence into various categories, including "[m]edical opinion" evidence and "[o]ther medical evidence." 20 C.F.R. §§ 404.1513(a), 416.913(a). On the one hand, a medical opinion is evidence "about what you can still do despite your impairment(s)" and whether you have impairment-related limitations to certain categories of listed activities. *Id.* § 404.1513(a)(2)(i)–(iv); *see id.* § 416.913(a)(2)(i)(A)–(D). Other medical evidence, on the other hand, includes "judgments about the nature and severity of your impairments[.]" *Id.* §§ 404.1513(a)(3), 416.913(a)(3).

The distinction is not merely academic. ALJs must "articulate" and "explain" how they "considered the supportability and consistency" of medical opinion evidence.

8

*Id.* §§ 404.1520c(b)(2), 416.920c(b)(2); *see also Jones v. Dudek*, 134 F.4th 991, 994 (7th Cir. 2025) (explaining the difference between medical opinion and other medical evidence). There is no similar articulation requirement for other medical evidence though, of course, ALJ's may not "[ignore] an entire line of evidence that support[s] a finding of disability." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (internal citations omitted).

The Commissioner also argues that the ALJ sufficiently addressed and considered the results of Strang's neurological testing and Dr. Frey's analysis of the same. The Commissioner first points to the ALJ's discussion of Strang's testimony that he was yelled at during work because of an inability to multitask and she noted Strang's problems with his memory and concentration. [DE 6 at 1096.] The ALJ also independently summarized the two 2018 neurological records Dr. Frey discussed. Concerning Strang's January 2018 neurological testing, the ALJ noted Strang's "basic attention was in the low average range, and memory was in the borderline range for delayed recall." [*Id.* at 1089.] The ALJ also noted the January 2018 neurological testing results indicated Strang may benefit from alcohol abuse treatment that could be associated with increased cognition. [*Id.*]

While insisting the ALJ ignored the full context of Dr Frey's testimony and Strang's neurological records, Strang ironically pins his entire argument on whether the ALJ discussed two words ("reasonable, hypothetically") uttered by Dr. Frey in response to a question by Strang's attorney. Strang's insistence that the ALJ was duty bound to explore each word of Dr. Frey's testimony is a trifle. Indeed, ALJs "are subject to only

the most minimal of articulation requirements." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024); *see also Morales v. O'Malley*, 103 F.4th 469, 471 (7th Cir. 2024) (explaining the minimal articulation requirement is "an obligation that extends no further than grounding a decision in substantial evidence") (citing *Warnell*, 97 F.4th at 1053).

I need not resolve the issue of whether Dr. Frey's brief comment constitutes a medical opinion or other medical evidence because I agree with the Commissioner that, in all events, the ALJ's conclusions are supported by substantial evidence. The ALJ did not explicitly refer to the passing exchange between Strang's attorney and Dr. Frey that it was "reasonable, hypothetically" for someone with Strang's neurological findings to require prompting and reminders, but *Warnell* and *Morales* are clear that she was not required to do so. The Commissioner acknowledges that the ALJ's comment concerning her disagreement with the view of Dr. Frey's testimony Strang's attorney presented at the August 2024 hearing could have been clearer. [DE 15 at 5.] But the ALJ's opinion sufficiently articulates her analysis of Exhibit 12F (NP Derucki's report), Dr. Frey's testimony, and her independent review of Strang's neurological records. She likewise tied her analysis of these sources to her conclusions concerning Strang's headaches, memory, and concentration. The ALJ can hardly be said to have "ignore[d] an entire line of evidence that is contrary to [her] ruling", *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009), by omitting Dr. Frey's brief answer to a single question posed by Strang's attorney two years earlier.

But what about Strang's argument that the ALJ ignored Dr. Frey's opinion that NP Derucki was in a better position to opine on Strang's symptoms? Recall that Dr.

10

Frey unremarkably testified "I have heard that, yes" when asked whether a treating physician might be in a better position to evaluate Strang's symptoms and limitations. [DE 6 at 555.] As the Commissioner explains, the ALJ was required to consider NP Derucki's relationship to Strang (as a treating provider) but did not need to articulate her consideration of that factor. *See* 20 C.F.R. § 404.1520c(b)(2) ("We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.") Strang's argument here morphs into a broader critique of the ALJ's consideration of Dr. Frey's testimony that she disagreed with certain of NP Derucki's opinions. Strang insists the ALJ was hyper-focused on the cause of Strang's headaches and did not consider the full context of Dr. Frey's testimony concerning NP Derucki's examination.

Contrary to Strang's assertions, the ALJ considered Dr. Frey's opinion of NP Derucki's examination concerning Strang's time off task limitations. The ALJ considered Strang's more recent work activity, social activities, and daily chores as further support for her conclusion that Strang did not have a more significant functional limitation. [DE 6 at 1100.] And Dr. Frey's testimony that she disagreed with the severity (regardless of the cause) of NP Derucki's conclusions concerning Strang's headaches supports the ALJ's conclusions concerning Strang's functional limitations. By concluding she found Dr. Frey's testimony more persuasive, the ALJ articulated a sufficient explanation for rejecting the portions of NP Derucki's report that opined Strang could not work. In essence, Strang is asking me to reweigh the evidence of Dr. Frey's testimony and NP

11

Derucki's report, which I cannot and will not do. *See Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022) (explaining that district courts do "not review medical opinions independently but rather review the ALJ's weighing of those opinions for substantial evidence").

## II.   NP Derucki

Strang next claims the ALJ failed to build a logical bridge between the evidence and her conclusion that a part of NP Derucki's testimony was unpersuasive regarding Strang's limitations and time off task. First, Strang says the ALJ's analysis of his work history is inconsistent with NP Derucki's opinion that he would likely be absent from, late to, or leave early from work more than four times per month. [*See* DE 6 at 979–80.] Strang is correct that the ALJ found NP Derucki's opinion unpersuasive in part because of Strang's "more recent work activity", "other social activities, and daily chores." [*Id.* at 1100.]

Strang's argument, however, ignores the ALJ's additional reasons for finding NP Derucki's opinion unpersuasive. The ALJ explained that Strang's untreated sleep apnea weakened NP Derucki's opinion concerning the frequency and impact of Strang's headaches. [*Id.* at 1099–1100.] What's more, NP Derucki's own treatment notes support the ALJ's conclusion. NP Derucki noted untreated obstructive sleep apnea as a cause of Stang's headaches, wrote that Strang "needs to treat OSP" (obstructive sleep apnea), and recommended a that a "sleep study" be performed. [*Id.* at 978–980.]

Strang claims the sleep apnea issue is a sideshow and argues the Commissioner points to "not a single regulatory or legal basis" which supports the notion that NP

Derucki's opinion should be discounted because of Strang's untreated sleep apnea. [DE 16 at 5.] Strang is incorrect. As the Commissioner points out, SSR-16-3p explains "if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." SSR 16-3p, 2017 WL 5180304, at *9. That seems to be precisely how the ALJ approached the evidence here. The ALJ reasonably concluded based on Dr. Frey's testimony and NP Derucki's own treatment notes that Strang's sleep apnea and his failure to treat it undermined NP Derucki's opinion concerning Strang's work-related limitations. That conclusion is grounded in substantial evidence.

In addition, the ALJ's analysis concerning Strang's part-time work, chores, and social activities passes muster. [DE 6 at 1100.] I agree with the Commissioner that the ALJ sufficiently explained her analysis of Strang's testimony concerning his work limitations. The ALJ acknowledged Strang's part-time work activity at a grocery store demonstrated he remained able to work under substantial gainful activity levels. [*Id.*] Moreover, the ALJ explained how Strang worked consistently for many years after his 1987 accident, did not receive significant treatment until 2018, and his medical records reflected stable conditions that did not "support worsening of his alleged conditions." [*Id.* at 1101.] While she may not have quoted every comment of Strang's testimony, it is clear to me that the ALJ adequately considered Strang's testimony concerning his functional limitations. Requiring more is unwarranted. *See Warnell*, 97 F.4th at 1053 (explaining that district courts should not "put[] the ALJ's written decision under a microscope and then flyspeck[] it").

13

Second, Strang says the ALJ erroneously relied on exhibits concerning unrelated ailments to support her conclusion discounting NP Derucki's opinion on Strang's functional limitations. The ALJ said she could not ignore hearing Exhibits 7F and 8F, which she concluded "show the claimant denying headaches." [DE 6 at 1100.] I take Strang's point that Exhibit 7F seems to primarily concern treatment for his shoulder pain. But as the ALJ noted, Exhibit 7F also includes notes of Strang reporting "no headaches and no dizziness." [*Id.* at 439.] Exhibit 8F appears to concern treatment for Strang's anxiety, gastrointestinal issues, and blood pressure. [*See id*. at 887–899.] I do not see where in Exhibit 8F Strang denies headaches and agree with Strang that the value of Exhibits 7F and 8F are limited to the analysis of Strang's headaches. But the ALJ's one sentence reference to these records at the end of a section describing the plethora of other evidence she relied on to support her conclusions concerning Strang's headaches, limitations, and Dr. Frey's and NP Derucki's opinions does not merit remand. As noted above, the ALJ's analysis and conclusions concerning NP Derucki's opinion are still supported by substantial evidence. *See Pavlicek v. Saul*, 994 F.3d 777, 781–83 (7th Cir. 2021) (affirming an ALJ's decision to discount a doctor's opinion where the analysis, though flawed, was supported by substantial evidence).

## Conclusion

Accordingly, the final decision of the Commissioner of Social Security denying plaintiff Jack R. Strang's applications for disability benefits and supplemental security income benefits is AFFIRMED.

The Clerk shall enter judgment in favor of the defendant Commissioner and against Strang.

SO ORDERED on March 4, 2026.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT